**William V. MASSEI, Defendant,
Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 5132.

United States Court of Appeals
First Circuit.

Feb. 27, 1957.

Woodbury, Circuit Judge, dissented.

Richard Maguire, Boston, Mass., Thomas J. Carens, Boston, Mass., on the brief, for appellant.

Daniel Needham, Jr., Asst. U. S. Atty., Boston, Mass., Anthony Julian, U. S. Atty., Boston, Mass., on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment entered in the United States District Court for the District of Massachusetts upon the verdict of a jury finding the appellant guilty on each of five counts of an indictment charging him with willfully and knowingly attempting to defeat and evade a large part of the income tax due and owing by him and his wife to the United States for the calendar years 1946, 1947, 1948, 1949 and 1950, in violation of § 145(b) of the Internal Revenue Code, 26 U.S.C. § 145(b).[1] The appellant was sentenced to concurrent terms of imprisonment of two years on each count and fined $5,000. Execution of sentence was stayed pending appeal. Although the nearly 800 page record before us contains voluminous facts that concern the many contentions made by appellant, as is the usual situation in such cases, we shall set forth only those facts that we believe pertinent to the disposition of this case.

The appellant was a member of the Police Department of Worcester, Massachusetts, from January 1923 to December 1951. The appellant's assignments as a police officer can be best presented by the chart below:

---

[1] "§ 145. *Penalties*

\* \* \* \* \*

"(b) *Failure to collect and pay over tax, or attempt to defeat or evade tax.* Any person required under this chapter to collect, account for, and pay over any tax imposed by this chapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution. \* \* \*"

| | |
|---|---|
| Jan. 2, 1923 to June 1, 1923 | Night patrolman. |
| June 1, 1923 to Feb. 15, 1924 | Plainclothesman on vice and liquor squad. |
| Feb. 15, 1924 to Dec. 4, 1931 | Precinct 1—night duty. |
| Dec. 4, 1931 to April 20, 1932 | Injured. |
| April 20, 1932 to Mar. 1, 1933 | Plainclothesman on headquarters squad.[2] |
| Mar. 1, 1933 to Jan. 15, 1934 | Precinct 1—night duty. |
| Jan. 15, 1934 to Jan. 20, 1936 | Plainclothesman on headquarters squad. |
| Jan. 20, 1936 to Jan. 10, 1938 | Precinct 1—night duty. |
| Jan. 10, 1938 to Sept. 11, 1939 | Plainclothesman on headquarters squad. |
| Sept. 11, 1939 to Jan. 6, 1940 | Precinct 1—night duty (promoted to sergeant). |
| Jan. 6, 1940 to June 1, 1943 | Headquarters squad, sergeant in charge. |
| June 1, 1943 to June 1, 1947 | Personnel officer.[3] |
| June 1, 1947 to Oct. 1, 1949 | License Board investigator.[4] |
| Sept. 8, 1947 | Promoted to lieutenant. |
| Oct. 1, 1949 to Dec. 31, 1951 | Personnel officer. |

Appellant's salary for the years 1946, 1947, 1948, 1949 and 1950 was $2,850, $3,300, $3,300, $4,080, $4,080, respectively. From 1937 to 1945 he earned from $2,100 to $2,850 a year. Although the payroll records for the years prior to 1937 had been destroyed and could not be produced, presumably he did not earn more than $2,100 a year during that period. Appellant's wife from 1933 to 1951 was a housewife with no source of money except that which the appellant gave to her. She has never at any time inherited or received as a gift any money or other valuables.

The Government established the above facts at the trial in attempting to prove that appellant had filed false and fraudulent joint tax returns, for himself and his wife, for the years 1946 to 1950, inclusive. The theory of the Government's case was that the joint net worth of the appellant and his wife was greater at the end than at the beginning of each year in issue, and that the source of their increased net worth was taxable income

which exceeded that reported in their joint tax returns.

In this connection the Government produced in evidence the joint returns of the appellant and his wife for the prosecution years which reflected total income of $3,232.62, $3,539.66, $4,549.28, $5,004.91 and $6,701.75 for the years 1946 to 1950, respectively. In contrast to the reported income the Government presented evidence tending to establish that on December 31, 1945 appellant had a net worth of $61,080.73 and that on December 31, 1950 appellant had an accumulated net worth of $149,504. Appellant's net worth increases and receipts during the prosecution years, based on records of purchases of annuities, automobiles, land and securities by appellant and his wife, were $27,265.38, $9,991.64, $5,533.22, $9,-599.72 and $36,033.31 for the years 1946 through 1950, respectively. Moreover, the Government established that prior to the indictment years there was evidence of receipts by appellant far in excess of the salary paid him. There was no evi-

---

2. Duties of the headquarters squad were the same as the vice squad, i. e. to suppress all forms of vice.

3. Duties of this office were to inspect the physical plant and personnel and to see

that patrolmen carried out their assignments.

4. Duties of this office were to investigate license applications for hackney carriages, taxi drivers, gas stations and parking lots.

dence that appellant had ever received any gifts or devises other than an one-half interest in a house which will be discussed below. Since, after a careful study of the record, we believe that the figures concerning opening net worth and increases in net worth during the prosecution years were sufficiently grounded in the evidence, it is not necessary to set forth in detail the many items of proof with respect to them.

As to the likely source of the appellant's net worth increases during the indictment years, the Government stated in its bill of particulars as follows:

"1. The likely source of unreported income of the defendant is moneys received by the defendant as an individual from many persons engaged in various illegal activities for the performance by the defendant of his official duties as a member of the Worcester Police Department, for the non-performance by the defendant of his official duties as a member of the Worcester Police Department, and for the performance by the defendant as a member of the Worcester Police Department, of services rendered to such persons in connection with such illegal activities."

The Government's theory, plainly stated, was that appellant throughout his career as a police officer had taken graft. The only evidence in support of this theory was that, during the period when the case was under investigation by the Treasury Department, the appellant, through an attorney who represented him only prior to trial, on four instances admitted to Government agents that appellant had taken graft during the pre-indictment years. This evidence was admitted over the appellant's objections and was relied upon by the prosecution to establish the source from which it was likely that the appellant derived his unreported income during the prosecution years.

The record discloses that on November 27, 1951 appellant's attorney arranged for the opening by the appellant of his safe deposit box in a Westerly, Rhode Island bank, so that agents Hurst and Calatrello might examine its contents. The agents testified in substance that while Hurst was dictating an inventory of the contents to Calatrello, Hurst turned to the appellant and asked him "the source of the funds that were used to acquire the various assets." The appellant replied that "it came from many different people at different times * * many years ago," whereupon appellant's attorney interrupted and stated that the appellant got the funds during prohibition days "from letting liquor trucks roll" through Worcester. The appellant then "picked up the conversation again and said he got the funds in the nature of a gift and therefore he didn't report it or he didn't think it was taxable."

Moreover, prosecution witnesses testified that on three occasions appellant's attorney, in the absence of the appellant, told them that the money spent by the appellant from 1946 to 1950 came from graft taken by appellant during prohibition days and while he was on the vice squad between 1933 and 1943. These occasions were as follows: (a) on an unspecified date in November or December 1951 to Hurst in his office; (b) on January 24, 1952 to Hurst in his office; and (c) on May 20, 1952 to Hurst and attorney Isber of the Treasury's District Counsel's office in Isber's office at a conference during which appellant's attorney was endeavoring to persuade Isber to recommend against criminal prosecution of the appellant.

Government witnesses also testified that during the conference of May 20, 1952 with Isber, appellant's attorney stated that in February 1949 the appellant obtained "X dollars, after the death of his father, who had saved a lot of cash" from a partnership interest in a tavern which was engaged in the illegal sales of liquor. F. Joseph Donohue, Register of Probate for Worcester County, testified that the petition for probate of the will and the will itself of Pilade Massei, appellant's father, had been duly filed and allowed but no inventory or account had ever been filed. John Bianchi,

executor of the will, testified that he had filed no inventory and that the only asset of the estate which he could find was a three tenement house in Worcester. It was established that the appellant in 1949 had received only an one-half interest in the three tenement house from his father's estate.

The trial judge, before admitting the agents' testimony concerning admissions made by appellant's attorney, held voir dire hearings on the attorney's authority to make such admissions for appellant. At these hearings testimony concerning the Treasury Regulations governing powers of attorney and appellant's attorney's statements was heard. Specifically, the Government presented evidence of many letters between appellant's attorney and agent Hurst showing that the attorney had acquired from appellant and had produced whatever information concerning appellant's finances that Hurst requested during the period of investigation before criminal prosecution was decided upon. The evidence revealed that the appellant through his attorney had cooperated fully with the investigating agents. However, the power of attorney that was supposed to have been given by appellant, as provided for by the Treasury Regulations, could not be produced, although there was substantial evidence that such a power of attorney had been filed.

After the voir dire the district court ruled that the statements of appellant's attorney would be admitted into evidence but "that the ultimate question of the authority of the agent to make admissions binding upon this defendant will be for the jury, under instructions which the Court will consider proper at the appropriate time."

Due to this ruling the appellant endeavored to establish the atmosphere and context in which his attorney's statements had been made. The appellant took the position and offered evidence to show that, at the conferences with Hurst and Isber, his attorney was speaking argumentatively and hypothetically with no intention of binding his client. For ex-

ample, the appellant offered testimony that his attorney cited decisions to Isber and that he had no personal knowledge of appellant's activities during prohibition and the time he was on the vice squad. The district court, at first, refused to allow such testimony and had it stricken when it was recited, stating that "anything that is a contention I am going to exclude, * * * I am not going to have anything go in that is a contention or an argument, whether it's by the Government or the defendant." Later in the trial, however, the court, without stating the reason for its change of mind, did allow such testimony. Indeed, the attorney, appellant's only witness, was permitted to testify at length that his entire presentation to Isber was a legal argument based upon hypotheses and assumptions. And in its charge the court clearly left it to the jury to determine if the attorney's remarks had been statements of fact or hypotheses, specifically stating "you may not consider them against the defendant, * * * if you find that the alleged statements of fact * * * were made as hypotheses."

The trial judge further charged, concerning the statements of graft taking, as follows:

"Now, if you find that the admissions alleged were made, you have to go a step further. Then it becomes your duty to determine if a source is established, because that is what is necessary. Now, I say this advisedly: the source which the Government alleges—and if I am wrong I desire to be corrected—is illegal payments by persons unknown to induce this defendant Massei to perform acts of misfeasance, malfeasance and nonfeasance, to do something that was improper, that was wrong, and that with particular application to the position which he held, a position of a fiduciary nature, a position of a police officer, a member of the police force of the City of Worcester. There is a presumption, and I am going to instruct you on this, there is a presumption that a

police officer does not receive illegal payments. That is a very, very efficacious presumption, and it would apply to other men holding offices of trust and confidence, but if you find that that presumption had been rebutted, and rebutted by the test that I have given you, has been rebutted, for example, by the admissions made by the defendant, so far as the presumption applies to him, then I charge you that you may infer, having in mind his continued position in the police department, you may infer that continued payments of this sort were a likely source of the increases in net worth reflected by the Government's evidence, if you find that they showed it."

The appellant objected to the admissibility of his attorney's statements on the grounds of relevancy and materiality, among others, and at the conclusion of the evidence generally moved to strike the testimony concerning the statements made by his attorney on the ground that they were not corroborated by the evidence.

At the close of the Government's case the appellant moved for a verdict of acquittal on the ground "that the evidence on each count is not legally sufficient to support a conviction." The court refused to pass on the motion in view of the fact appellant had not rested his case. At the close of all the evidence appellant renewed his motion for a verdict of acquittal, stating specifically to the court, among other things, that as to likely source the Government had presented only "these alleged admissions by [appellant's attorney] talking about the defendant's activities back in prohibition days, and also the defendant's activities back when he was on the Vice Squad—all prior to 1943. There is absolutely nothing, if your Honor please, in this case, by way of evidence bearing on the years in question—absolutely nothing."

On appeal the appellant presents as contentions, among others, that the alleged admissions made by him through his attorney were unauthorized, irrele-

vant and uncorroborated. Further, he argues that without these admissions the Government failed to prove a likely source of the appellant's increases in net worth. Therefore, appellant contends the district court should have granted his motion for a verdict of acquittal made at the close of all the evidence.

The Government, on the other hand, urges that the question of whether appellant's attorney had the authority to make the statements in issue properly was left to the jury. As to relevancy, it urges that the statements were relevant as to the establishment of the starting net worth, as to likely source and as tending to prove previous tax evasions, which, the Government claims, would show fraudulent intent on the part of appellant to evade his taxes during the prosecution years. Moreover, the Government seems to maintain that the admissions of graft taking were fully corroborated by independent evidence that appellant remained on the police force through the indictment years and that appellant had net worth increases that cannot be explained in any other way.

■ After a careful consideration of the record and the briefs, we are of the opinion that the judgment of conviction cannot stand mainly on the ground that the admissions of appellant through his attorney, whether they were properly admissible or not, as the only evidence of likely source, were not corroborated by independent evidence. In view of this the trial judge erred in not striking out the admissions and in not granting the appellant's motion for a verdict of acquittal. Although we believe the crucial issue in this case is that dealing with corroboration of the aforementioned admissions, we shall also touch upon other questions involved therein.

The Supreme Court in Holland v. United States, 1954, 348 U.S. 121, 125, 75 S. Ct. 127, 130, 99 L.Ed. 150, stated "that the Government deems the net worth method useful in the enforcement of the criminal sanctions of our income tax laws. Nevertheless, careful study indi-

cates that it is so fraught with danger for the innocent that the courts must closely scrutinize its use." Further, the Court, 348 U.S. at page 129, 75 S.Ct. at page 132, declared that "Appellate courts should review the cases, bearing constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." After these general cautionary remarks, the Court set forth certain safeguards for net worth cases. In this connection it was stated, 348 U.S. at pages 137–138, 75 S.Ct. at page 136, that "Increases in net worth, standing alone, cannot be assumed to be attributable to currently taxable income. But proof of a likely source, from which the jury could reasonably find that the net worth increases sprang, is sufficient." Recently, in reviewing a civil tax deficiency case, we interpreted the above language as meaning that proof of a likely source is "an indispensable element of the net worth method in any of its applications." Thomas v. Commissioner of Internal Revenue, 1 Cir., 1956, 232 F.2d 520, 526.

Generally, likely source has been proved in net worth cases in two ways. Where the taxpayer disclosed ownership of a business it was considered sufficient proof of likely source for the Government to establish that the disclosed business was capable of producing much more income than was reported. Holland v. United States, supra. Also, where the taxpayer was an owner of an undisclosed business, proof that the undisclosed business was capable of producing income was considered sufficient. United States v. Johnson, 1943, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546.

But absent an income producing business, proof of likely source has been of a different kind. For example, in United States v. Chapman, 7 Cir., 1948, 168 F.2d 997, 999, certiorari denied 1948, 335 U.S. 853, 69 S.Ct. 82, 93 L.Ed. 401, where the bill of particulars in effect stated "that the source of the 'other income' was the illegal sale of meat at overceiling prices," the Government introduced the evidence of seven meat peddlers all of whom testified that during the year 1943 they paid overceiling prices, paying the excess in currency either to Chapman, the defendant, or his agents. Likewise, in United States v. Skidmore, 7 Cir., 1941, 123 F.2d 604, certiorari denied 1942, 315 U.S. 800, 62 S.Ct. 626, 86 L.Ed. 1201, where the theory of the Government apparently was that defendant had received unreported income from payments for "protection", there was some evidence of payments made to the defendant by bookmakers.

And in a recent case, which bears a striking similarity to the case at hand, where the Government's theory was that the unreported taxable income was graft received by the defendant for nonperformance of his duties as a policeman and as a member of the vice squad, "[a]lthough there was no direct evidence that the defendant ever received a bribe, the evidence did disclose that he had 'opportunities' flowing from his position in charge of the investigation of vice." United States v. Ford, 2 Cir., 1956, 237 F.2d 57, 60. The evidence in the Ford case as to "opportunities" of the defendant to receive bribes, though seemingly not essential to the majority's holding, disclosed that there was wide open gambling in Rochester, New York when the defendant was on the vice squad; that the defendant did not take any action against one selling policy slips, although he knew about it; that statistics of gambling cases disposed of in the City Court of Rochester indicated an upswing in prosecution of gambling after other officers had been assigned to the squad; and that the defendant was on friendly terms with a professional gambler. See also Ford v. United States, 5 Cir., 1956, 233 F.2d 56, certiorari denied 1956, 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53.

In the instant case the only direct evidence of likely source were the admissions made by appellant through his attorney in which the latter stated that appellant had taken graft during pre-indictment years. Primarily we must consider, insofar as necessary, the appel-

lant's contention that these statements were inadmissible.

■ First we turn to the three instances when appellant's attorney stated to the Government agents, in the absence of appellant, that appellant had taken graft. "The general rule is that, upon the trial of an accused person, evidence of another offense, wholly independent of the one charged, is inadmissible." Bracey v. United States, 1944, 79 U.S.App.D.C. 23, 142 F.2d 85, 87, certiorari denied 1944, 322 U.S. 762, 64 S. Ct. 1274, 88 L.Ed. 1589. In this connection it was stated in Railton v. United States, 5 Cir., 1942, 127 F.2d 691, 693:

"* * * It is logical to conclude, and very apt to be concluded, that because a man was dishonest once he will steal again. It is certainly 'more probable' that a crooked official did steal than if he were an upright one. Yet our law forbids these very premises. It cannot be shown that the accused has committed other similar crimes to show that it is probable he committed the one charged. * * *"

■ It follows from the above cases, we believe, that it was error for the district court to admit these admissions into evidence and to charge the jury, as it did, that from the admission of graft taking during pre-indictment years it could infer appellant continued taking graft during the indictment years, and thus find likely source. It is not a legally permissible inference, absent some reasonable connection, that appellant having committed a criminal act in the past, continued to do so. Such an inference,

in essence, would fly in the face of the above quoted rule that "[i]t cannot be shown that the accused has committed other similar crimes to show that it is probable he committed the one charged." Railton v. United States, supra 127 F.2d at page 693. See also Lovely v. United States, 4 Cir., 1948, 169 F.2d 386; Sang Soon Sur v. United States, 9 Cir., 1948, 167 F.2d 431; Bracey v. United States, supra.

Moreover, we do not believe that the admissions of graft taking prior to 1943, when appellant, as a patrolman during prohibition and as a member and head of the vice squad at a later date, had opportunities open to him for graft, were connected with the prosecution years, since there was no evidence whatsoever showing that these opportunities continued during the indictment years when appellant performed totally different duties as personnel officer and license board investigator. See United States v. Adonis, 3 Cir., 1955, 221 F.2d 717. Nor do we think that these admissions, due to the remoteness in time from the indictment years and due to the change in appellant's duties as a police officer, are relevant as to likely source, as tending to establish a common design or plan, which seems to have been the situation in Green v. United States, 1 Cir., 1949, 176 F.2d 541.

However, it might be contended, aside from the issue of the authority of appellant's attorney to make such statements,[5] that even though the admissions might not be relevant as to likely source, they would be admissible if they are relevant as to other elements of the crime, specifically opening net worth and intent [6] to

5. We note in passing that "[w]hether there was sufficient proof of the agency to warrant the admission of the acts and declarations of the agent in evidence, was a preliminary question for the court to determine." In re Cliquot's Champagne, 1865, 3 Wall. 114, 140, 70 U.S. 114, 140, 18 L.Ed. 116. However, the district court here submitted the question of agency to the jury only after holding voir dire hearings and presumably it would not have done so if it had not been con-

vinced that there was sufficient proof of the agency. Under such circumstances we do not believe it was prejudicial error for the court to leave the question to the jury.

6. The Government states that the tax return history of appellant prior to the indictment years shows very little other income besides his police salary. Further, it urges that from the admission of receipt of graft previous to the indictment a jury could find that in the pre-

evade taxes. See Green v. United States, supra. Although this might be so, it is significant that the lower court instructed the jury to consider the statements of graft taking only as to likely source. In this connection the court charged:

"Now also, with respect to [appellant], there has been some testimony as to his past conduct. Please bear in mind that that evidence was allowed in only as it has some bearing upon the issue of the source of the defendant's income and as bearing upon the charge before this court. You are to consider it only on that issue alone."

■ Furthermore, we are of the opinion that even if the court had charged the jury to consider the statements of graft taking on the issues of opening net worth and intent to evade taxes, it would have been error. As to opening net worth, the Government certainly did not need these declarations of graft taking to prove appellant had sizeable holdings on December 31, 1945 by reason of the fact that appellant contended, as appears from all events leading up to the trial, that he had even more money than the Government gave him credit for on that date. As to the intent to evade taxes, assuming prior evasions were relevant, we do not believe that the circumstances surrounding the prior evasions would be relevant. The jury could have been informed of the prior evasions, if any, without mention of the graft taking. Since it was the prior evasions, in themselves, that had probative value as to intent to evade and not the graft taking, the admissibility of such prejudicial evidence would not have been warranted on this issue.

Therefore, the only purpose, as manifested by the court's charge, that these admissions could have served would be to prove that appellant continued taking

graft during the indictment years. This, as we have discussed above, is not a permissible inference. To hold otherwise, in our considered judgment, would be to run the danger of convicting the appellant for the taking of graft some years before the indictment when the indictment charges him with income tax evasion.

Our views on admissibility, as expressed above, also apply to the statement made by the attorney, in appellant's presence, concerning graft taking by appellant during prohibition, at the Westerly, Rhode Island bank on November 27, 1951. In fact, this admission in referring only to graft taking during prohibition was even farther removed in time and circumstance from the indictment years than the others.

But, notwithstanding the issue of admissibility, the aforementioned admissions should not have gone to the jury as part of the Government's case since they were not corroborated. In Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192, where the defendant had made extrajudicial admissions concerning his net worth which the Government presented as part of its case, the Supreme Court held that an admission embracing a vital element of the crime made after the fact to an investigating official must be corroborated by sufficient independent evidence. In so holding the Court stated, 348 U.S. at page 155, 75 S.Ct. at page 198:

"The negative implications of petitioner's opening net worth admission formed the cornerstone of the Government's theory of guilt. Without proof that assets on hand at the beginning of the prosecution period did not account for the alleged net worth increases, the Government could not succeed. * * * An admission which assumes this im-

indictment years Massei evaded his income taxes. Previous evasions constitute relevant evidence of present intent to evade. See Mitchell v. United States, 9 Cir., 1954, 213 F.2d 951, certiorari denied 1955, 348 U.S. 912, 75 S.Ct. 290, 99 L.

Ed. 715; United States v. Sullivan, 2 Cir., 1938, 98 F.2d 79; Tinkoff v. United States, 7 Cir., 1936, 86 F.2d 868, certiorari denied 1937, 301 U.S. 689, 57 S.Ct. 795, 81 L.Ed. 1346.

portance in the presentation of the prosecution's case should not go uncorroborated, and this is true whether we consider the statement an admission of one of the formal 'elements' of the crime or of a fact subsidiary to the proof of these 'elements.' It is the practical relation of the statement to the Government's case which is crucial, not its theoretical relation to the definition of the offense."

Similarly, we believe that in the case before us the statements of graft taking, made by appellant's attorney, "formed the cornerstone of the Government's theory of guilt," since without them there would be no proof of likely source. In the Smith case, the Court, after reviewing evidence, independent of the admissions, dealing with the defendant's assets, was satisfied that there was sufficient evidence corroborating the defendant's admissions as to net worth. Likewise, in United States v. Calderon, 1954, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202, where the admissions of the defendant also concerned net worth, the Court found corroboration.

 The Government, apparently influenced by the nature of the evidence reviewed by the Supreme Court in the above two cases in deciding the issue of corroboration, in its brief has set forth in great detail its independent evidence as to the appellant's assets and net worth increases. Then it urges that just as that type of evidence was held to be sufficient corroboration of the admissions in Smith and Calderon, it should be so held here. As additional evidence of corroboration it points to the fact that appellant was proved to have been a police officer as stated in his admissions.

We cannot agree with the Government on this point. We think that independent evidence of the defendants' expenditures, assets and bookkeeping techniques was held sufficient corroboration in Smith and Calderon, either as bolstering the admissions or as evidence tending to establish the crime independent of the admissions, by reason of the fact that

the admissions in those cases concerned the net worth of the defendants. Here the admissions of graft as relating to likely source disclosed from *where* appellant's net worth increases likely came. Only independent evidence of some actual graft taking or, at least, opportunity for graft taking could serve as sufficient corroboration of such admissions. Evidence of unexplained net worth increases does not either bolster the admissions of likely source or establish this element of the crime independent of the admissions, for that evidence, independent of the admissions, does not tend to prove from *where* the net worth increases likely issued.

Nor does the fact that the Government, in addition, independently proved that appellant was a member of the police force during prohibition and a member of the vice squad prior to 1943 provide the necessary corroboration for the preindictment years. And certainly independent proof that appellant remained on the police force during the indictment years also falls short of the corroboration, especially since the appellant during the indictment years was performing duties different from those referred to in his admissions.

 The Government had to present some evidence of actual graft taking or opportunity for such in order to establish the element of likely source independent of the admissions. Since it failed to do this, the district court should have stricken the evidence concerning the admissions from the record. And since without the admissions there was no evidence of likely source in the record, it should have granted appellant's motion for a verdict of acquittal.

Finally, we must turn to the Government's contention, which the district court adopted in its charge, that even without proof of likely source the appellant could be convicted under the indictment for the year 1949 under the holding of United States v. Adonis, supra. That case seems to hold that where a defendant has made a "calculated misrepresentation designed to conceal current in-

come" [at p. 720] proof of likely source is not necessary. The Government would have us look upon the statement of appellant's attorney, made on May 20, 1952 before Government attorney Isber, that appellant obtained "X dollars" from his father's estate in 1949, as such a "calculated misrepresentation."

Here, too, the Government's contention must fall. In the Adonis case the defendant had previously misrepresented the source of his income in a judicial proceeding so as to carefully explain away most all his income for the year under indictment. In the case before us appellant's attorney while urging against criminal prosecution presented the appellant's inheritance without even stating an amount. Since we do not believe this was a "calculated misrepresentation" within the meaning of the Adonis case, we believe that case is inapplicable.

While we have mentioned the Adonis case, above, and the Second Circuit Ford case, earlier in this opinion, we do not mean to infer that we either approve or disapprove of the exceptions to the necessity of proving likely source that these holdings seem to have established. Suffice it to say that we believe that constitutional guarantees of a defendant must be as zealously guarded in tax evasion cases based upon the net worth theory as they are in other criminal cases. Inroads upon the enunciated net worth safeguards can only result in forcing the accused to prove his innocence, an inherent danger of the net worth theory from inception.

A judgment will be entered vacating the judgment of the District Court, setting aside the verdict, and remanding the case for further proceedings not inconsistent with this opinion.

WOODBURY, Circuit Judge (dissenting).

It seems to me that proof of position on a municipal police force, where everyone knows opportunities for graft exist, is as much proof of a likely source of unreported income as is proof of ownership of a business capable of producing income. Cf. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150. And this is especially true where there is evidence, which I think admissible, indicating that a position on the police force had been a bountiful source of unreported income in the form of graft in prior years.

The admissions made by the appellant's attorney were, I think, clearly within the scope of his authority to speak for the appellant. I cannot recognize the legitimacy of such a "special authority" as that contended by the appellant, whereby the authority for the admission depends on facts subsequent to the utterance, i.e. if the admission works out to the advantage of the principal it was authorized, but if ultimately disadvantage results, there was no authority. And the fact that the admissions constituted evidence of the commission of a crime other than the one for which the appellant was on trial does not necessarily render the admissions inadmissible. Relevancy is the test of admissibility of this kind of evidence. That is to say, the degree of probative force as weighed against the possibility of undue prejudice determines admissibility. Irrelevant testimony of the commission of some crime other than the one with which a defendant is charged is so highly prejudicial that it is not admissible for that reason.[1] But otherwise relevant testimony is not rendered inadmissible only because of its tendency to show the commission of another crime. Green v. United States, 1 Cir., 1949, 176 F.2d 541, 543. Whether the prejudicial tendency

---

1. Evidence of the commission of another unrelated crime can not be admitted merely to prove the defendant a "bad man," and therefore more likely to have committed the crime alleged than a "good man" with a clean record. While such evidence may in some situations be of some remote relevance, the probability of undue prejudice to the defendant therefrom so far outweighs its probative force with respect to the particular crime alleged that it is universally excluded.

of relevant evidence of the commission of some other crime outweighs its probative value in the case on trial is a matter committed to the discretion of the trial court. Here the evidence of prior graft as a police officer is so logically relevant to prove a continuing source of unreported income that I think the court not only did not abuse its discretion in admitting the evidence but was quite right in doing so. It seems to me that proof of substantial increases in net worth during the prosecution years, coupled with evidence of a thorough but fruitless search for a non-taxable source for those increases, served the dual purpose of providing adequate corroboration for the admissions of graft-taking during pre-prosecution years and in addition warrants the inference that the appellant continued to take graft during the years covered by the indictment. The fact that the appellant's assignments as a police officer during the prosecution years were different from his previous assignments does not indicate that he did not take graft during the indictment years. I think there can be little doubt that opportunities for graft exist whatever a police officer's assignments or rank may be. Indeed, with higher rank the opportunities probably would increase. I would affirm on the general line of reasoning followed by Judge Hincks in United States v. Ford, 2 Cir., 1956, 237 F.2d 57.