**Bernard G. McGARRY, Defendant,
Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 6925.

United States Court of Appeals
First Circuit.

Dec. 27, 1967.

Rehearing Denied Feb. 2, 1968.

*cert den.*
394 U.S. 921

Edward Bennett Williams, Washington, D. C., with whom Peter R. Taft, Washington, D. C., and John Warren McGarry, Boston, Mass., were on brief, for appellant.

Edward F. Harrington, Asst. U. S. Atty., with whom Paul F. Markham, U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Appellant appeals from his conviction for income tax evasion, in violation of 26 U.S.C. § 7201, for the calendar years 1959, 1960, and 1961. Error is alleged

in the district court's refusal to admit into evidence a net worth chart and supporting testimony prepared by appellant's expert witness; in the admission into evidence of certain statements allegedly made by appellant to revenue agents; in the court's refusal to suppress certain evidence obtained through allegedly wrongful seizure; and in the court's refusal to hold hearings on motions to suppress and dismiss based on wiretapping and other alleged invasions of privacy.

### Appellant's Net Worth Chart

The first question is whether, this being a case in which the government utilized the net worth method of proving unreported taxable income, the court erred in excluding a net worth statement submitted by an expert witness of appellant. The net worth method seeks to derive taxable income in any given year by determining from all available evidence of assets and liabilities the increase (or decrease) in taxpayer's net worth over a twelve month period, adding to it his non-deductible expenses for that year, and subtracting from that sum any amount attributable to non-taxable sources. For example, if a taxpayer begins the year with a net worth (cost of property less liabilities) of $40,000, ends it with $50,000, and has spent $7,500 during the year on living expenses, his receipts must have been at least $17,500. And if there is no likely non-taxable source of funds, such as gifts or inheritance, this set of facts constitutes strong circumstantial evidence that the receipts were taxable income.

The critical foundation for the computation is the starting net worth position. The government, to derive its point of beginning in 1959, the first taxable year, used net worth statements given by appellant some years before to revenue agents who were then investigating him. They covered the years ending December 31, 1945 through December 31, 1954. For part of this period appellant made a civil settlement for additional tax, fraud and other penalties, and interest. Appellant's net worth reported by him, as of December 31, 1954, was $36,377.75.

This the government took as its starting point making several adjustments, mostly in appellant's favor (such as adding loans receivable), resulting in a beginning net worth figure of $55,346.07. The government then proceeded to analyze appellant's net worth each year thereafter through the tax years in issue, making detailed studies of his investment in or loans due from five or six corporations, together with his interest in other property, and liabilities. Drawing upon the testimonial and documentary evidence given at trial, an expert prepared and testified from a chart showing taxable income for each of the years in question considerably above that shown in the returns.[1]

The defense was based principally on appellant's contention that in 1950 he had received a cash gift from his father in the amount of $300,000. This cash hoard, he argued, not only accounted for increases in his assets but was available for and should have been credited to his non-deductible living expenses. Since both his increases in assets and his personal expenditures were explainable by a non-taxable source, there existed no basis for concluding that he failed to report any taxable income.

The existence of this alleged cash hoard was not only appellant's case on the merits below, but exclusion from evidence of a net worth chart assuming its existence, is a major basis for this ap-

---

1. The following figures from the government's net worth chart indicate the extent of appellant's alleged unreported income:

|  | 1959 | 1960 | 1961 |
|---|---|---|---|
| Taxable income | $63,342.44 | $34,008.37 | $54,933.82 |
| Reported income | 24,445.16 | 27,042.38 | 24,065.19 |
| Unreported income | $38,897.28 | $ 6,965.99 | $30,868.63 |

peal. We review, therefore, the evidence on this point.

The initial evidence of the alleged gift came from appellant's brother who testified that he witnessed the transfer of $300,000 by his father to appellant in the basement of McGarry's Tavern one day in 1950. As to the subsequent history of the cash hoard, he further testified as follows:

"Q. Now, whether or not, sir, as a result of that gift you know whether or not your brother spent any of it? A. Yes, he has.

"Q. Right up to the present time? A. Through the years."

A government witness, Nasif, had testified that in September of 1952, during the course of the investigation for the years 1946–1951, appellant was asked if he had ever received any inheritances and answered that he may have although he was not certain at the time. It was after this conversation that appellant's accountant, who had been present at the interview, prepared the first series of net worth statements. The accountant testified that he knew of the $300,000 gift, that he told the investigators about it, but that he did not include it in the net worth statements because he considered the gift non-taxable.[2] Nasif denied being told of any gift and said that had such a gift been reported there would have been no additional tax assessed against appellant. A civil settlement was entered into for the years 1949–1951, in the amount of $5,204, covering additional tax and a 50 per cent fraud penalty.

The government, attempting to negate the existence of the cash hoard, introduced evidence that in 1940 appellant's father, the alleged source of the $300,000 gift, lost his home by foreclosure, the outstanding mortgage then being $1,600; that from 1943 to 1945 his annual wage as an employee of Bethlehem Steel Company was $3,000; that from 1946 to 1951 his sole reported source of income was his salary from his own establishment, McGarry's, Inc., the highest amount being $2,600 in 1947; that at the time of his death he was living in a Veterans Housing Project apartment leased to a son, appellant's brother; and that on his death he left no estate and that no inheritance tax, gift tax, or estate tax return was filed on his behalf. Appellant himself had a mortgage on his own home from 1947 until he sold it in 1960 and obtained a mortgage on his summer home in 1953 which remained in effect until he sold it in 1963.

Committed to the cash hoard theory as the only explanation of his true wealth, appellant sought to introduce into evidence a net worth chart prepared by his own expert witness. This chart commenced with an "equity" or net worth figure for December 31, 1954 of $357,283.72, compared to the government's figure of $55,346.07. It showed a steady diminution of net worth to a figure in 1961 of $299,336.95, compared to the government's showing of increases to a 1961 figure of $244,490.17. The end result was a showing of no unreported income between 1955 and 1961, compared to the government's showing of unreported income in each year, aggregating $190,885.15. The critical difference between the appellant's exhibit and that of the government lay in the figures for cash on hand as of December 31, 1954— $288,000 in appellant's exhibit and $6,000 in the government's exhibit.

While the government took its figure from appellant's own 1954 net worth statement to which we referred earlier, appellant's expert testified that he began his computations as of December 31, 1951 by adding the $300,000 cash gift to appellant's cash figure of $18,000, reported on his net worth statement for that date. He then worked forward from that starting point of $318,000 in 1951 and arrived at a cash figure of $288,000 at the end of 1954 by doing a

2. According to Nasif's notes, however, appellant answered questions directed to receipt of gifts exceeding $100 or inheritances by indicating that such data would be included in the net worth statement which he agreed would be forthcoming.

net worth analysis on the basis of appellant's tax returns and net worth statements.[3]

The district court excluded this chart. In a post-trial memorandum and order addressing appellant's motion for a new trial, the court cited as the most important reason for the rejection of the summary exhibit the fact that it was not based on the evidence.[4] This had also been the chief thrust of the argument of government counsel.[5]

Appellant charges that this ruling, excluding his expert's net worth chart and testimony, was error because the court applied standards to this chart which were more strict than those applied to the government's chart or those required by law. He argues that his expert's cash figure of $288,000 as of the critical starting point, December 31, 1954 (and, for that matter, the cash figure for each successive year), was supported by the evidence. Starting with $318,000 of cash as of December 31, 1951 (the cash gift of 1950 plus the $18,000 reported in appellant's net worth statement for 1951), which was "spent through the

years", appellant reasons that the evidence of outflow from this reservoir between 1951 and the starting point was supplied by the same expenditure data used by the government. He contends that the court misunderstood the law when it declared (see n. 4) that there had been no evidence showing to what extent, if at all, the cash hoard remained unspent in any particular year. Appellant urges that he is entitled to the benefit of what he calls "The single paramount rule * * * that cash-on-hand must be applied against expenditures unless there is affirmative evidence of some other disposition."

Our difficulty is not with this principle but with its application to the facts of this case. What is lacking here is the predicate for its invocation, i. e., proven cash on hand. To put it another way, appellant seeks to use a method for attributing expenditures to known available resources to prove the existence of those resources. To view his argument starkly, he asserts that, as a matter of law, the district court had to assume (1) that nothing was spent from the cash

---

3. The record is far from clear how appellant's expert proceeded. At one point he testified that his cash-on-hand figure in 1951 was $300,000; at another point the figure is $318,000. As to method, he testified: "I took the $300,000 that was in evidence, took the tax returns and the net worths that were introduced in evidence and made a calculation, and I also took into consideration [revenue agent] Roberson's schedule that he made of monies available from 1946 through 1954." While we try to follow the explanation of appellant's witness as to how he derived a 1952 cash-on-hand figure from his 1951 starting point, we are unable to follow his arithmetic. We assume, however, that his data and technique in bridging the gap from 1951 through 1954, and thereafter, were identical or similar to those the government used, except for the additive factor of the cash hoard.

4. The memorandum, in salient part, is as follows:
"This exhibit was excluded for several reasons, the most important being that the defense elicited not one iota of testimony concerning the manner in which this alleged sum of money was expend-

ed. Even assuming that a gift of $300,-000 did take place, there was not a scrap of admissible testimony to show whether the money was retained unspent, or was expended in one year or two, or, as the exhibit purported to show, was expended over the period 1955–1961 in amounts precisely reflecting the Government's proof of expenditures in that period. This being so, the summary exhibit was not based on evidence in the case, but upon mere suppositions and conclusions. It was, therefore, not a summary of the evidence and was properly excluded. * * * It is enough that there was no evidence of the manner in which the alleged $300,000 was spent, so that the chart in no way could be thought of as a summary of evidence in the case."

5. On voir dire, he urged, "The fatal error in this chart is this: Assuming that the defendant did have $300,000 in cold cash in 1951—assuming that he had that and his brother counted it, $300,000—there isn't a scintilla of evidence as to what happened to the money after that. There isn't a bit of evidence as to what happened to the $300,000 after that."

hoard in 1950, the year of receipt; (2) that nothing was spent in 1951; (3) that, from 1952 through 1954, nothing more nor nothing less was spent from the reserve than an amount equalling appellant's non-deductible expenses; (4) that, from 1955 through 1958, up to the prosecution period, nothing more nor less than the amount of such expenditures was spent; and (5) that sufficient cash remained during the prosecution years, 1959–1961, to cover all increases in net worth.

We cannot accept as a legal imperative the substitution of such a chain of assumptions for direct evidence of cash on hand available during a given year. A close reading of all the authorities cited by appellant on this point confirms our view. In United States v. Caserta, 199 F.2d 905 (3d Cir. 1952), the court properly held that the government could not double count a taxpayer's known cash withdrawals from his bank and purchases made from cash in a given year without proof that the purchases had no connection with the withdrawals. In Marcella v. Commissioner of Internal Revenue, 222 F.2d 878 (8th Cir. 1955), the court reversed the Tax Court for failing to credit a $17,490.71 increase in bank loans, the proceeds of which were available to taxpayer, against his expenditures. The precision of the figure underscores the absence of speculation about the existence of "cash on hand" at the beginning of the tax period. In United States v. Altruda, 224 F.2d 935 (2d Cir. 1955), the government had failed to credit against expenditures certain realty income received in two tax years. Not only was the amount of this income during the tax years not in dispute, but the court, in assuming that it was spent, was influenced by the fact that defendant had reported a cash-on-hand figure at the end of the tax period of only $100. We confess our inability to read anything into such cases which requires the kind of leap appellant would have us take.

The remaining case cited by appellant on this point, United States v. Costello, 221 F.2d 668 (2d Cir. 1955), aff'd, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), is, to our mind, positive support for our view. Appellant seeks comfort from the action of the court in ruling that it was unreasonable for a jury to assume that the defendant had a smaller cash reserve at the beginning of the tax period than $40,000. But the court noted that defendant's "situation was far from ordinary", that defendant was a large-scale gambler and "had always kept such reserves in large amounts". 221 F.2d at 673. More pertinent to the issue now before us is the reasoning of the court in upholding the trial judge's refusal to admit in evidence on defendant's behalf earlier deficiency assessments against him. These were sought to be used to prove that defendant had much more unreported income in pre-indictment years than appeared in the prosecution's computation and that therefore he began the indictment years with a cash reserve large enough to cover all purchases.

Judge Learned Hand, writing for the court, said:

"Costello did not suggest that he meant to supplement the assessments by showing how much of the alleged unreported net income had been spent for consumable purchases, or how much remained, or might have remained, as a concealed cash reserve on January 1, 1946. He stood upon their admissibility as they read.

\*  \*  \*  \*  \*  \*

"If they were competent, they were relevant to show that Costello had received $90,000 of unreported net income more than the prosecution had succeeded in proving that he had received of unreported gross income during the eight years before January 1, 1946. That could, indeed, have been one link in a chain of reasoning to prove that he might have had a cash reserve in his hands on January 1, 1946; but it would be only a link, and it proved nothing, unless accompanied by evidence as to what had been done with the income so received. So far as Costello or his wife might have

spent it for consumable goods, or have otherwise disposed of it, it could not be part of a cash reserve; and there was no presumption that they had not so spent it." 221 F.2d at 674.

Counsel in the case before us urged in argument that were appellant obliged to show how the cash reserve was spent, the Fifth Amendment would be violated. The Supreme Court has weighed this argument, saying in Holland v. United States, 348 U.S. 121, 138–139, 75 S.Ct. 127, 99 L.Ed. 150 (1954):

> "Once the Government has established its case, the defendant remains quiet at his peril. Cf. Yee Hem v. United States, 268 U.S. 178, 185, 45 S.Ct. 470, 472, 69 L.Ed. 904. The practical disadvantages to the taxpayer are lessened by the pressures on the Government to check and negate relevant leads."

Had the linkage between dates and amount been supplied, as in Epstein v. United States, 246 F.2d 563 (6th Cir.), cert. denied, 355 U.S. 868, 78 S.Ct. 116, 2 L.Ed.2d 74 (1957); and Kampmeyer v. United States, 227 F.2d 313 (8th Cir. 1955), cert. denied, 351 U.S. 904, 76 S. Ct. 706, 100 L.Ed. 1441 (1956), appellant's chart would have been entitled to admission. Without such evidentiary linkage, it may well be that such a chart is inadmissible as a matter of law. See Oertle v. United States, 370 F.2d 719, 727–728 (10th Cir. 1966), cert. denied, 387 U.S. 943, 87 S.Ct. 2075, 18 L.Ed.2d 1329, 6/5/67; United States v. Moody, 339 F.2d 161, 162 (6th Cir. 1964), cert. denied, 386 U.S. 1003, 87 S.Ct. 1347, 18 L.Ed.2d 432 (1967); United States v. Kiamie, 258 F.2d 924, 932–933 (2d Cir.), cert. denied, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 230 (1958). But we need go no farther here than to say that the district court acted within permissible bounds of discretion.

Wholly apart from the soundness of the district court's ruling on admissibility of the net worth exhibit, we see no prejudice to appellant. Admittedly the rejection of appellant's exhibit gave the prosecution an opening for argument which it vigorously seized and its exhibit had no competition for the jury's attention in the jury room. Nevertheless it is perfectly clear from the evidence, the argument, and the charge that the key issue in the case was the existence of the cash hoard. Appellant's expert testified to the effect, in eliminating tax liability, of a much higher starting net worth figure in 1955.[6] Counsel's argument to the jury centered on the issue of the existence of the cash gift. A substantial part of the court's instructions was devoted to this issue. And counsel in his brief on appeal states, "In the case at bar, the appellant went to the jury primarily on the accuracy of the opening net worth, contending that he had $300,000 which the government did not include."

The jury therefore had the issue of the cash gift before them to the extent that their finding against appellant necessarily determined its nonexistence. The excluded chart was not, and could not have been, affirmative evidence of the receipt of the gift. Its relevance, so far as it had any, was simply that it was a graphic means of illustrating how, if appellant had received and retained the gift for the appropriate period, his income would not have been understated. Since, however, the jury, as the case was ultimately presented to it, necessarily rejected the basis upon which the chart

6. "Q. Now, insofar as the item listed here 'net worth' is concerned, following that throughout the years '55 to '61, Mr. Linnehan, what if any, what computations —would you explain the computations used in that instance? A. Well, he starts off at 12/31/55 net worth $52,327.36. He says less prior net worth $55,346.07. If that figure were $355,000, then everything '56, '57, '58, '59, '60 and '61 would fall. So the opening net worth figure of $55,346.07 is the starting point. If that was in error, everything else would be in error all the way through. Q. Now, sir, when you say, 'all the way through,' that would, on the figure you gave, eliminate any taxes due throughout the years? A. Yes, sir."

was prepared, we state, as an alternative holding herein, that any error in the exclusion of the chart could not have been prejudicial.

### Admissions to Revenue Agents

■ A second error is alleged, in the admission into evidence of a 1958 memorandum of an internal revenue agent, Pastore, that appellant had told him that his 1957 income tax return included income of $4,000 from parimutuel winnings.[7] Pastore, no longer in government service, had no memory of the conversation which led to the memorandum. Nor was his memory refreshed by reading it. And while he at first stated that he did not know whether the contents were true and correct and conceded that he had sometimes signed papers without reading them, he subsequently, on four occasions during the trial, testified that the memorandum was true and correct as of the date of its making.

Appellant, citing 3 Wigmore, Evidence § 747 (3d ed. 1940), argues that the memorandum was inadmissible as past recollection recorded for the reason that Pastore's testimony indicates he could not vouch for its accuracy from habit or course of business. We think the memorandum properly admitted. A document is not rendered incompetent solely because an attesting witness may acknowledge that he sometimes signs papers without reading them, where the record is replete with references to testimony by the same witness that a specific document was true and correct at the time of its making.[8]

■ Appellant also assigns as error the reception of testimony from another internal revenue agent, Nasif, that, in the course of a tax investigation in 1952, appellant stated that part of his income from 1946 to 1951 came from gambling and bookmaking. Appellant was said also to have stated that he operated alone, did not lay off any bets, and stopped these operations as of November 1, 1951. This testimony is attacked as introducing evidence of early offenses, independent of those charged, unnecessary to the proof of wilfulness in view of the admitted payment of a fraud penalty for the years 1949 through 1951, and uncorroborated by other evidence.

Admission of Nasif's statements was not prejudicial. Appellant's brother testified, as part of the case for the defense, that appellant had been associated with his father in gambling operations until the time of his father's death in December 1951 and that these operations constituted the principal source of his father's cash. This evidence of source was essential to appellant's case in order to explain how an elderly man, living in modest circumstances, on low wages, and having had financial difficulties, could accumulate such a large cash hoard. The evidence of appellant's association in gambling with his father may not have been helpful to appellant, but it was given by a defense witness and was not made tactically necessary by prosecution testimony. It is clear that appellant

7. Appellant feels this was prejudicial because it indicated a likely source of unreported income and might have led the jury to conclude that appellant's involvement with both gambling and bookmaking had not ceased on his father's death.

8. We note, in addition, that the authority relied on by appellant warns against the rigid application of inflexible dogmas. "Courts should cease to treat [the "past recollection recorded" rule] as anything but provisional and [a] crude aid to truth. The trial Court's discretion should be allowed to control. There should be liberal interpretation and liberal exemption. And no ruling of admission should ever be deemed an error worth noticing on appeal." Wigmore at § 755. While we may not go so far as to adopt the quoted language above, we deem the court in this instance to have acted within its discretion.

The government also submits that the document in question was admissible as a federal business record. 28 U.S.C. §§ 1732–33; Connelly v. United States, 249 F.2d 576, 587–588 (8th Cir. 1957), cert. denied, 356 U.S. 921, 78 S.Ct. 701, 2 L. Ed.2d 716 (1958). Since we find it admissible as past recollection recorded, we do not reach this argument.

cannot successfully claim prejudice from the fact that both defense and prosecution daubed him with tar from the same brush.

■ What we have just said applies even if the admission of the Nasif testimony were error. But we do not think it error. Appellant's accountant had submitted a net worth statement showing appellant's cash on hand as of December 31, 1951 as $18,000. Appellant's compensation as an officer and employee of McGarry's Incorporated was supplemented in his tax returns by an entry under the caption of commission salesman, which proved to represent gambling and bookmaking receipts. That appellant should have included in his explanation of his financial position such activities as subject to opprobrium as bookmaking is some evidence that there had been no large inheritance. If a legitimate source of wealth had existed, so a jury might justifiably reason, there would be little sense in basing the explanation on a less respectable source. Moreover, appellant's statement that he operated alone could have led the jury to find that his father was not in the gambling business, that he therefore did not accumulate a large cash reserve to give to his son, and that the gambling operation at McGarry's, not stemming from the father's operations, was continued as a likely source of income for appellant.

The very facts that in 1951 appellant hid this income under a misleading caption, that in 1952 he was warned of his inadequate records, that in 1957 he was found to have reported gambling winnings under the rubric, "various sources —$4000", and that another such caption appeared in 1958 tend to show a pattern of looseness in reporting and record-keeping congenial to those engaged in gambling pursuits. We cannot say that the earlier as well as the later evidence is irrelevant on the issue of wilfulness. See Holland v. United States, supra, 348 U.S. at 139, 75 S.Ct. 127.

Appellant seeks to equate the facts here with those in Massei v. United States, 241 F.2d 895 (1st Cir. 1957),

aff'd, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed. 2d 517 (1958), in which we held that it was error to receive testimony of an admission of graft long antedating the indictment years where the admission was uncorroborated, and there was no evidence of continuity of or even opportunity to engage in such activity. Here the admissions, as we have noted, were corroborated by defense testimony, were relevant to the issue of credibility of the cash hoard theory, and were tied in with a pattern of misleading reporting and continuity of involvement in gambling, a possible source of unreported income. Finally, we note that both at the time of the Nasif testimony and during the charge, the judge gave the jury appropriate instructions.

### Motions to Suppress

The prosecution introduced many business records concerning enterprises with which appellant was associated. These documents, necessary to the government's net worth analysis, were subjected to repeated motions to suppress. Error is charged in the court's denial of these motions. The litigation history of these particular records is already almost uniquely protracted.

In Lord v. Kelley, 223 F.Supp. 684 (D. Mass.1963), the district court held that although an administrative subpoena had been prepared for service on appellant's accountant, one Donald Lord, a turnover of records of appellant and his companies was accomplished without resort to the subpoena, by measures found to be coercive, so that the records were wrongfully seized. The records were ordered returned but not permanently embargoed, the court noting that the agent who prepared the subpoena had previously known of the records. We dismissed an appeal from that part of the order which refused a permanent injunction in future criminal proceedings on the ground that the government had not yet sought production of the records. Lord v. Kelley, 334 F.2d 742 (1st Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 650, 13 L. Ed.2d 556 (1965). The government soon

issued summonses for many of the same records, the district court ordered them enforced, and we affirmed the judgment in McGarry's, Inc. v. Rose, 344 F.2d 416 (1st Cir. 1965), holding that the government could reacquire the records by legal process for use in a future criminal proceeding.

While we might simply say that the issue of the production through legal process of these records has been foreclosed, we note that the initial order of the district court in Lord v. Kelley, supra, proscribed use of otherwise unknown information gleaned only from the illicit custody of the seized records. Appellant has claimed that subsequent summonses were fatally infected by scrutiny of the illegally seized records. We have reviewed all of the evidence on this issue and must reject the claim.

To begin with, as appellant's witness, a former revenue agent, testified, the first subpoena had listed all possible categories of business records. To know that records relevant to the status of a business include ledgers, journals, cancelled checks, bank statements, vouchers, corporate minute books, cash receipts and disbursement records, deposit slips, ending inventory reports, and corporate correspondence is hardly today an occult art. An apprentice investigator would ask for such records. This is no more than the government did in this case.

■ It operated, however, from a great deal more information than an apprentice would have. Long before the illegal seizure, government agents had studied a large volume of records, had had the advantage of interviews with appellant's accountant and many man hours of analytical work. So far as we can tell from the record, all that the illegal seizure contributed was a basis for comparing what had been received with what had been requested in order to avoid duplication when a later summons was issued for additional records. Close analysis reveals that so-called "clues", mentioned by appellant's witness, led only to such boilerplate items as check book stubs, bank statements, and inventory records. It is clear to us that this is not a case where an illegal search has revealed unsuspected data which is sought to be blanketed under a later "legal" subpoena. Cf. Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

Appellant argues that the ruling in McGarry's, Inc. v. Rose, supra, will permit wholesale violations of the Fourth Amendment. We do not share this apprehension. We suspect that the government would ordinarily seek to avoid both the inconvenience of delay when records are required to be returned and the risk of a judicial finding that valuable leads were obtained while records were in wrongful custody. To impose the greater sanction of permanent immunization whenever a seizure of ordinary business and corporate records has been invalidated would place an incommensurate burden on the government, unnecessary for the protection of commercial privacy. Indeed, such a sanction could lead taxpayers to play a game, inviting seizure on the chance that it could arguably be converted into an effective vaccination against any future use of such routine records.

*Motions for Hearings*

Appellant urges two points related to invasion of privacy in the nature of wiretapping. The first challenges the adequacy of hearing on an admitted wiretap and the second challenges the failure of the district court to hold a voir dire hearing on the issue whether a "pen register" device had been attached to appellant's telephone to record numbers called.

■ On the first day of trial the prosecution disclosed that a wiretap had been placed on the telephone of a Miami, Florida resident from August 1962 through August 1963 and that in July or August of 1963 two incoming calls of appellant were recorded, in which appellant expressed interest in gambling operations, i. e., laying off bets. The court then held a voir dire in which the agent in charge of the tap, Yung, testified that

a government employee or "informant" in Miami had the responsibility of changing the tapes and sending them to Washington, that no record of the conversation was kept, and that the tapes were erased after Yung had listened to them. Yung transmitted no information regarding these calls during the investigation of appellant and had occasion to recall the conversations only two months before trial when he was given a long list of names (including that of appellant) by the General Counsel of the Internal Revenue Service.

The government filed an affidavit that no evidence illegally obtained or "tainted" or any leads therefrom had been submitted to the Grand Jury or would be used in trial. There was no evidence as to gambling other than that stemming from appellant or his witnesses (which we have above discussed). There was no evidence involving individuals in Miami. Appellant, indeed, does not assert any basis for concluding that the wiretap resulted, directly or indirectly, in any evidence adduced at trial.

Appellant was given the opportunity to re-subpoena Yung to the stand for a second voir dire but did not do so. His chief ground for asserting error is that he was not allowed time, before trial resumed, to produce other witnesses and particularly to examine the government employee who had custody of the tapes at the site of the wiretap. While it would have been better practice for the government to have made its confession of wiretapping well in advance of trial, we cannot say that the court gave an inadequate opportunity to appellant to explore the implications of the tap. The remoteness in time of the two conversations, the remoteness of the subject matter from that of willful tax evasion, the lack of any apparent connection—even after vigorous cross-examination—between the tapes and any evidence of event, place, or person presented at trial, and the predominantly custodial respon-

sibilities of the employee at the tap site are adequate grounds for the court's exercise of its discretion. It fully discharged its responsibility to "give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939).

■■■ As to the claim that it was error for the court not to have held a voir dire hearing on the possible use of a pen register, the appellant first filed a motion alleging the use of such a device and seeking the suppression of any resulting leads or information. It was signed by counsel, but contained no oath or averment as to the truth of the allegation. It and eleven other motions for suppression were denied for lack of "solidity", being unsworn. Subsequently, appellant filed a similar motion alleging use of a pen register, enclosing a memorandum requesting identification of the subscribers to some 58 telephone numbers, and also seeking the unpublished numbers for appellant and McGarry's, Inporated.[9] The memorandum closed with a notation that the information was "for" a special agent of the Internal Revenue Service. The motion was signed by appellant and his attorneys as "true to the best of my knowledge and belief".

There was no indication that the list of numbers affixed to the supplementary motion had been obtained by a pen register. The motion was no more "solid" than that in United States v. Flynn, 103 F.Supp. 925, 930 (S.D.N.Y.1951), aff'd, 216 F.2d 354 (2d Cir. 1954), cert. denied, 348 U.S. 909, 75 S.Ct. 295, 99 L.Ed. 713 (1955). Moreover, the government had filed an unreserved denial, on affidavits, of use of any illegally obtained evidence. See United States v. Casanova, 213 F. Supp. 654, 657 (S.D.N.Y.1963). The district court was warranted in refusing hearing on the use of such a device. We

---

9. We note that, had the list been the result of the use of a pen register, there would be no explanation why unlisted numbers for named subscribers would be requested, i.e., a pen register converts pulses only to numbers, not names.

note, finally, that appellant, prevented at trial from pursuing inquiry before the jury as to use of a pen register, did not request to examine telephone company and internal revenue officials on a voir dire.

■ Other motions to suppress were filed on the basis of testimony given by a former revenue officer before a Senate Subcommittee that he and others had observed appellant's premises with spyglasses and had even broken into appellant's home. The extracts of such testimony annexed to the motions reveal that the former agent observed a jacket bearing the label "Leighton's Clothing Store". The prosecution, however, introduced no expenditure evidence relating to this item or this store, doubting the reliability of the agent who had been suspended and indicted at the time of his Senate testimony, and was convicted before the trial of this case. Again, appellant failed to make a showing that any tainted evidence had been used.

This was a vigorously contested twenty-one day trial, preceded and accompanied by many oral and written motions. We think that the rights of appellant were zealously urged and fairly protected.

Affirmed.

## ON PETITION FOR REHEARING

In seeking rehearing appellant again complains of the exclusion of his proffered "net worth chart" and certain expert testimony. We think he confuses the stringent burden of proof imposed on the government in a net worth prosecution with the proper foundation which must be laid to render evidence admissible in any case. Appellant has not met the latter requirement, as we explained in our opinion. Without repeating all of the grounds for that conclusion, we note especially that he would have us hold that certain net worth statements provided by him to the government for the years 1950–1954, which do not reflect the existence of the cash hoard allegedly received by gift in 1950, do in fact reflect all expenditures made from that hoard. We recognize that appellant was free to prove that his cash on hand for these years was in the neighborhood of $300,000, rather than between $5,000 and $18,000 as he had reported. But we cannot hold that, as a matter of law, the court was forced to accept the uniform expenditure figures in his statements of $6,000 a year as evidence of the extent to which the cash hoard had or had not been dissipated during those years.

As an alternate ground of decision, we held that even if the district court had erred in excluding the proffered evidence, appellant was not prejudiced in presenting his defense that the gift had been made and that the government's opening net worth figure was therefore erroneous. We can but reiterate that it is clear from the record that the key issue in the case was the existence of the alleged gift and consequent cash hoard. Expert testimony as to the impact of the alleged hoard on the government's net worth chart was, in fact, admitted in evidence even without any evidence that the hoard was in existence at the beginning of the period covered by the chart. The issue of the existence of the hoard and its impact was argued at length to the jury. The court gave complete instructions on the government's burden of proof, on the government's obligation to run down "leads" such as that offered by appellant and discrediting them, and of the impact of evidence casting doubt upon the opening "net worth" figure in the government's case. Under the circumstances we cannot see how petitioner can, except by failing to consider pertinent portions of the record, claim prejudice.

Petition denied.